**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

Nos. 15-3350 & 15-3579
_____

MAURICE MARIE DIDON,
                    Appellant in No. 15-3579

v.

ALICIA DOMINGUEZ CASTILLO
                    Appellant in No. 15-3350
_____

APPEAL FROM THE UNITED STATES DISTRICT
COURT FOR THE MIDDLE DISTRICT OF
PENNSYLVANIA
(M.D. Pa. No. 1-15-cv-01586)
District Judge:  Honorable Christopher C. Conner

Argued:  June 22, 2016
_____

Before:  MCKEE, *Chief Judge*, FISHER and
GREENAWAY, JR., *Circuit Judges*

(Filed: September 26, 2016)

Anthony J. Vetrano, Esq. **[ARGUED]**
Vetrano Vetrano & Feinman
630 Freedom Business Center Drive
Suite 215
King of Prussia, PA 19406
*Counsel for Maurice Marie Didon*

Michelle Pokrifka, Esq. **[ARGUED]**
CGA Law Firm
135 North George Street
York, PA 17401
*Counsel for Alicia Dominguez Castillo*

_____

OPINION

_____


GREENAWAY, JR., *Circuit Judge*.

The Hague Convention on the Civil Aspects of
International Child Abduction[1] allows a parent[2] to petition for

_____

[1] Hague Convention on the Civil Aspects of
International Child Abduction, Oct. 25, 1980, T.I.A.S. No.
11,670, 19 I.L.M. 1501 [hereinafter Hague Convention]. The
Hague Convention has been ratified by the United States and
is implemented by the International Child Abduction
Remedies Act ("ICARA"), 22 U.S.C. § 9001 et seq. (formerly
at 42 U.S.C. § 11601 et seq.). According to ICARA, courts
must "decide [] case[s] in accordance with the Convention."
*Id.* § 9003(d).

the return of a child when that child has been removed or retained from her "habitual residence" country in violation of the parent's custody rights in that country. The petition at issue in this case concerns two children (A.D. and J.D.) retained by their mother in the United States who hail from the Caribbean island of Saint Martin. That 34-square-mile island is comprised of two legally distinct, yet highly integrated, countries—French Saint Martin (where the children went to school) and Dutch Sint Maarten (where the children had their home).[3] To complicate matters further, the Hague Convention is recognized by French Saint Martin (through France),[4] but is not recognized by Dutch Sint Maarten.[5]

---

[2] The Convention may be invoked by any person or entity that has custody rights over a child, *see* Legal Analysis of the Hague Convention on the Civil Aspects of International Child Abduction, 51 Fed. Reg. 10494, 10505 (Mar. 26, 1986) [hereinafter Legal Analysis], but for the sake of simplicity we will refer to the "parent" of a child as invoking the Convention.

[3] We will use the term "Saint Martin" to refer to the entire island, "French Saint Martin" to refer to the French country, and "Dutch Sint Maarten" to refer to the Dutch country.

[4] *See* France—Declarations/Reservations, Convention of 25 October 1980 on the Civil Aspects of International Child Abduction, https://www.hcch.net/en/instruments/conventions/status-

The extraordinary facts of this case require us to decide an issue of first impression: may a child have two "habitual residence" countries at the same time under the

---

table/notifications/?csid=619&disp=resdn ("[T]he Government declares that the Convention shall extend to the whole of the territory of the French Republic.").

[5] *See* Netherlands—Declarations/Reservations, Convention of 25 October 1980 on the Civil Aspects of International Child Abduction, https://www.hcch.net/en/instruments/conventions/status-table/notifications/?csid=634&disp=resdn; Netherlands—Extensions, Convention of 25 October 1980 on the Civil Aspects of International Child Abduction, https://www.hcch.net/en/instruments/conventions/status-table/extensions/?cid=24&mid=634; Netherlands Ministry of Security and Justice, Guide for International Cases of Child Abduction to Foreign Countries (May 2016), https://www.government.nl/binaries/government/documents/leaflets/2014/04/15/guide-for-international-cases-of-child-abduction-to-foreign-countries/2016-05-11-herziene-guide-for-international-casesof-child-abduction-to-foreign-countries.pdf ("[T]he Convention does not apply to [Dutch Sint Maarten]."); Country Reports on Human Rights Practices for 2015: Netherlands, U.S. Department of State, http://www.state.gov/j/drl/rls/hrrpt/humanrightsreport/index.htm?year=2015&dlid=252883 ("[Netherlands] is a party to the 1980 Hague Convention on the Civil Aspects of International Child Abduction, but the convention does not apply to . . . [Dutch] Sint Maarten . . . .").

Hague Convention ("concurrent habitual residence"[6])? We conclude that the text of the Convention does not permit concurrent habitual residence. We therefore look to the ordinary meaning of the term "residence" and hold that the children were habitual residents only of the country in which they "lived"—Dutch Sint Maarten. Because Dutch Sint Maarten does not recognize the Convention, the Convention does not apply to this case.

Accordingly, we will vacate the District Court's judgments and dismiss the petition. Because the District Court granted the petition as to A.D., we will also instruct the District Court to order that A.D. be returned to the United States forthwith.

---

[6] The authorities on this issue are inconsistent in their usage of terminology. The phrases "concurrent habitual residence," "alternating habitual residence," and "dual habitual residence" are sometimes used interchangeably. However, "concurrent habitual residence" refers to a situation where a child is habitually resident in two countries *at the same time*, whereas "alternating habitual residence" refers to a distinct situation where a child is moved in between two countries on a regular basis (known as "shuttle custody") such that her habitual residence alternates between those countries. "Dual habitual residence" can be used to refer to either or both situations. For the sake of clarity, we will refer to the phrases "concurrent habitual residence" and "alternating habitual residence" in the manner just described and will not use the term "dual habitual residence."

## I.	FACTUAL BACKGROUND AND PROCEDURAL HISTORY

### A.	Factual Background[7]

The parties' dispute in this case revolves around two children—A.D. and J.D. A.D. is the biological son of Petitioner Maurice Marie Didon ("Didon") and Respondent Alicia Dominguez Castillo ("Dominguez"), and J.D. is the biological daughter of Dominguez from a prior relationship. Dominguez moved to Dutch Sint Maarten in 2007, leaving J.D. behind in the Dominican Republic. Dominguez subsequently met Didon in 2008 and moved into his apartment in Dutch Sint Maarten in 2009. On November 3, 2010, A.D. was born, and shortly thereafter, in 2011, J.D. moved into the Dutch Sint Maarten apartment.

After J.D. moved in, Didon and Dominguez petitioned the French consulate to change J.D.'s birth certificate to list Didon as her father. That petition was granted and a new birth certificate was issued for J.D. listing Didon as her father and Dominguez as her mother. Although Didon characterizes this process as an "adoption" of J.D., "the parties never appeared before a court or otherwise formally engaged in the adoption process." App. vol. I at 6.

---

[7] The following facts are taken from the District Court's factual findings and are unchallenged by the parties unless otherwise noted.

The family resided at the Dutch Sint Maarten apartment for the next three years. Throughout this time period, although the family resided in Dutch Sint Maarten,[8] it was "primarily oriented" to French Saint Martin "where Didon worked, and where the children attended school,[9] went to doctor's appointments, etc." App. vol. I at 5. "Further, the family's administrative affairs, such as the children's insurance, were managed [in French Saint Martin]." App. vol. I at 14.

In July 2014, Didon filed a custody action in French civil court seeking full custody of A.D. and J.D. Dominguez was neither served with papers in the action nor otherwise notified of the custody proceeding. During the pendency of

---

[8] The District Court acknowledged that Didon owned a two-unit apartment building in French Saint Martin, which the family used both as a rental unit for tourists and for "personal use." App. vol. I at 14−15. However, on the basis of testimony that the family "did not reside there permanently and only stayed there together five or six times per year," the District Court concluded that the apartment was not "the parties' *primary* residence" and was only used "periodic[ally]." App. vol. I at 15 n.13.

[9] Dominguez argues that only J.D. attended school in French Saint Martin, but the record contains evidence suggesting that A.D. attended school in French Saint Martin as well. *See* App. vol. II at 141. The District Court's finding that both children attended school in French Saint Martin was not clearly erroneous.

7

the action, Dominguez informed Didon that she would be taking A.D. and J.D. to New York City on August 27, 2014 to attend her sister's wedding. Dominguez advised Didon that she and the children would return on September 7, 2014, and showed Didon three round-trip airline tickets from Dutch Sint Maarten to New York City to that effect.

On September 6, 2014, Didon contacted the children's school to inform the school that J.D. would be absent due to a vacation to the United States. Didon was told by school administrators that the school was not expecting J.D. to return because Dominguez had disenrolled the children. Didon immediately contacted the police, who were able to get in contact with Dominguez by telephone on the same day. Didon claims that Dominguez promised on the call to return with the children the following day, as planned, but Dominguez claims not to have made such a promise. Dominguez did not return with the children on September 7.

In the children's absence, Didon continued to pursue his French custody action and, on March 23, 2015, the French court granted full custody of A.D. and J.D. to Didon in an ex parte order.[10] At the same time, Didon had hired a private investigator to look for the children and, in the summer of

---

[10] Dominguez alleges that Didon procured this judgment by fraud. She argues that we should deny his petition because he seeks equitable relief and comes before us with unclean hands. However, we have expressly rejected the application of the unclean hands doctrine to Hague Convention petitions. *See Karpenko v. Leendertz*, 619 F.3d 259, 265 (3d Cir. 2010).

2015, the investigator located them in Hazleton, Pennsylvania.

**B.     Procedural History**

On August 13, 2015, Didon filed the instant Hague Convention petition in the Middle District of Pennsylvania seeking the return of A.D. and J.D. to French Saint Martin.[11] Didon also filed an ex parte motion seeking a temporary restraining order and an expedited hearing on the merits of his petition.

On August 14, 2015, the District Court held an ex parte telephone hearing with Didon's counsel, after which it entered an order directing the U.S. Marshals Service to serve a copy of the order and petition on Dominguez, and to confiscate the passports and other travel documents of Dominguez, A.D., and J.D.  The District Court also granted Didon's request for a temporary restraining order and enjoined Dominguez from removing A.D. and J.D. from the Middle District of Pennsylvania pending a hearing on the merits of the petition.  The District Court subsequently held hearings in the matter on September 2 and September 22, during which both parties presented testimony and other evidence.

On September 24, 2015, the District Court rendered judgment, granting Didon's petition as to A.D. and denying

_____

[11] Under ICARA, a petition must be filed with a court "authorized to exercise its jurisdiction in the place where the child is located at the time the petition is filed."  22 U.S.C. § 9003(b).

9

the petition as to J.D. The District Court began by fixing the date of retention as September 7, 2014—the day on which Dominguez had promised to return from the United States with the children. It then examined where the children were habitually resident prior to that date. It observed: "The parties' testimony reveals that the border [between Dutch Sint Maarten and French Saint Martin] is so permeable as to be evanescent, and is regularly and readily traversed by residents and travelers alike. . . . [F]or most purposes of its residents' daily life, the island is essentially undivided." App. vol. I at 13. It highlighted testimony about the family's extensive contacts with both countries and concluded that "the record facts, in addition to the nature of the island itself, support a finding that J.D. and A.D. were habitual residents of *both* [Dutch] Sint Maarten and [French] Saint Martin." App. vol. I at 15.

In support of its conclusion, the District Court distinguished cases holding that a child may have only one habitual residence country at a time as "deciding whether the child had abandoned a prior habitual residence in favor of a new one." App. vol. I at 15. It also invoked dicta from *Mozes v. Mozes*, 239 F.3d 1067 (9th Cir. 2001) referencing "the rare situation where someone consistently splits time more or less [evenly] between two locations, so as to retain alternating habitual residences in each." App. vol. I at 16 (internal quotation marks omitted) (quoting *Mozes*, 239 F.3d at 1075 n.17).

The District Court bifurcated the remainder of its analysis. With respect to A.D., the District Court noted that the parties were in agreement that Didon had custody rights under French law because A.D. is his biological son. The District Court also noted that Didon was exercising those

10

custody rights until Dominguez took A.D. to the United States. Because Dominguez retained A.D. from his habitual residence in violation of Didon's custody rights under French law, the District Court concluded that A.D. was "wrongfully" retained under the Hague Convention and granted the petition as to A.D.

With respect to J.D., the District Court began by observing that Didon did not have custody rights over J.D. through adoption because his purported "adoption" did not satisfy the requirements of French law to vest custody. The District Court also rejected Didon's argument that the French court's ex parte custody order vested him with custody rights over J.D. at the time of retention because "the judgment was not issued until more than six months *after* the alleged wrongful retention date of September 7, [2014]." App. vol. I at 19. Because Didon did not have custody rights over J.D. under French law at the time of retention, the District Court concluded that J.D. was not "wrongfully" retained under the Convention and denied the petition as to J.D.

Dominguez filed a motion for an emergency stay of the District Court's judgment with respect to A.D. pending appeal, which the District Court denied without comment on September 25, 2015. A.D. was subsequently transferred from Dominguez to Didon on that same day.[12]   Didon and

---

[12] The result of our decision today is that A.D. must be transferred back to the United States from Saint Martin. After that transfer, A.D. will have been relocated between Saint Martin and the United States three times in two years. We are naturally concerned that these multiple relocations of the child have been or will be detrimental to his well-being. *See Chafin v. Chafin*, 133 S. Ct. 1017, 1026 (2013).

11

Dominguez filed cross-appeals from the District Court's judgments with respect to J.D. and A.D., respectively.

## II.    JURISDICTION AND STANDARD OF REVIEW

The District Court had jurisdiction over the Hague Convention petition pursuant to 28 U.S.C. § 1331 and 22 U.S.C. § 9003(a).  We have jurisdiction over the parties' cross-appeals of the District Court's judgments pursuant to 28 U.S.C. § 1291.

---

Accordingly, we reiterate here that a district court issuing a return order in a Hague Convention matter should seriously consider the possibility of staying that order pending appeal.  While we do not endorse "[r]outine stays" in such matters, a district court should carefully consider the traditional stay factors when "considering whether to stay a return order":

> (1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies.

*Id.* at 1027 (internal quotation marks omitted) (quoting *Nken v. Holder*, 556 U.S. 418, 434 (2009)).

12

We review the District Court's conclusions of law de novo and its factual findings for clear error.[13] *Karpenko*, 619 F.3d at 262−63. Accordingly, we will uphold the District Court's factual findings if its "account of the evidence is plausible in light of the record, even if . . . we would have weighed the evidence differently." *Id.* at 263 (alteration in original) (internal quotation marks omitted) (quoting *Tsai-Yi Yang v. Fu-Chiang Tsui*, 499 F.3d 259, 270 (3d Cir. 2007)).

## III. ANALYSIS

---

[13] Didon argues that the District Court's determination that the children were concurrent habitual residents of Dutch Sint Maarten and French Saint Martin is a factual finding that we must review for clear error. However, Didon's argument conflates the related, but distinct, questions presented by this case.

The determination of where a child is habitually resident is a mixed question of law and fact. *Feder v. Evans-Feder*, 63 F.3d 217, 222 n.9 (3d Cir. 1995). "On such questions we employ a mixed standard of review, accepting [a] district court's historical or narrative facts unless they are clearly erroneous, but exercising plenary review of the court's choice of and interpretation of legal precepts and its application of those precepts to the facts." *Id.* Under this standard, the question of whether a child may have concurrent habitual residence countries under the Hague Convention "defines the concept of habitual residence," *id.*, and therefore is a classic legal question over which we exercise plenary review.

The Hague Convention was designed to "deter parents from engaging in international forum shopping in custody cases." *Karpenko*, 619 F.3d at 263 (internal quotation marks omitted) (quoting *Tsai-Yi Yang*, 499 F.3d at 270). To that end, it provides a return remedy that seeks to "restore the status quo" that existed prior to the "wrongful" removal or retention[14] of a child from her habitual residence country. *Id.* (internal quotation marks omitted) (quoting *Tsai-Yi Yang*, 499 F.3d at 270). The Convention deems a removal or retention to be "wrongful" where:

> a) it is in breach of rights of custody attributed to a person, an institution or any other body, either jointly or alone, under the law of the State in which the child was habitually resident immediately before the removal or retention; and
>
> b) at the time of removal or retention those rights were actually exercised, either jointly or alone, or would have been so exercised but for the removal or retention.

Hague Convention, *supra*, at art. 3.

---

[14] Because Didon permitted Dominguez to travel to the United States with the children, Didon has alleged only a wrongful retention of the children. *See Feder*, 63 F.3d at 220 n.4. Therefore, we will not discuss wrongful removal.

In evaluating whether the petitioning parent has made that showing, a court must determine: (1) when the removal or retention took place; (2) where the child was habitually resident immediately prior to the removal or retention; (3) whether the removal or retention violated the petitioning parent's custody rights under the law of the child's habitual residence; and (4) whether the petitioning parent was actually exercising those custody rights at the time of the removal or retention, or would have exercised those rights but for the removal or retention.[15] *Karpenko*, 619 F.3d at 263.

In this case, we need only examine the second question (habitual residence), which proves dispositive. The District Court concluded that the Hague Convention permits the children to have concurrent habitual residence in Dutch Sint

_____

[15] "Once the petitioner meets its initial burden, the respondent may oppose the child's return by proving one of five affirmative defenses." *Karpenko*, 619 F.3d at 263. Before the District Court, Dominguez unsuccessfully sought to invoke the affirmative defense that there is "a grave risk that [A.D.'s] return would expose him to physical or psychological harm or otherwise place [him] in an intolerable situation." *Id.* at 263 n.3. Dominguez does not present any argument on this point on appeal and so has waived our consideration of the affirmative defense. *See Tsai-Yi Yang*, 499 F.3d at 269 n.9. In any event, as the District Court concluded, the sketchy and sharply disputed evidence of Didon's alleged abuse of A.D. does not approach the level of "clear and convincing evidence" required to prove the affirmative defense. *Karpenko*, 619 F.3d at 263 n.3.

Maarten and French Saint Martin. We conclude that the Hague Convention does not permit concurrent habitual residence and hold that the children were habitually resident only in the country in which they lived—Dutch Sint Maarten. Because Dutch Sint Maarten does not recognize the Hague Convention,[16] the Convention does not apply to this case. *See* Hague Convention, *supra*, at arts. 4 & 35; *Karkkainen v. Kovalchuk*, 445 F.3d 280, 287 (3d Cir. 2006); Legal Analysis, *supra*, at 10504 ("[T]he Convention may be invoked only where the child was habitually resident in a Contracting State and taken to or retained in another Contracting State."). Accordingly, the petition must be dismissed.

**A.** *The Hague Convention Does Not Permit Concurrent Habitual Residence*

In determining whether the Hague Convention permits concurrent habitual residence, we begin our analysis with the text of the treaty. *See Abbott v. Abbott*, 560 U.S. 1, 10 (2010) ("The interpretation of a treaty, like the interpretation of a statute, begins with its text." (internal quotation marks omitted) (quoting *Medellín v. Texas*, 552 U.S. 491, 506 (2008))). As with a statute, where the text of a treaty is unambiguous, we apply the treaty as written and the analysis is complete. *See Chan v. Korean Air Lines, Ltd.*, 490 U.S. 122, 134−35 (1989); *United States v. Duarte-Acero*, 208 F.3d 1282, 1285 (11th Cir. 2000).

We conclude that the text of the Hague Convention unambiguously contemplates that a child may have only one habitual residence country at a time. Rather than referencing

---

[16] *See supra* note 5 and accompanying text.

16

"*a* State" of habitual residence or "the *States*" of habitual residence, the Convention repeatedly refers to "*the State*" of habitual residence. *See, e.g.*, Hague Convention, *supra*, at Preamble ("The States signatory to the present Convention, . . . Desiring to . . . establish procedures to ensure the[] prompt return [of children] to *the State* of their habitual residence . . . ." (emphasis added)); *id.* at art. 3 ("The . . . retention of a child is to be considered wrongful where . . . it is in breach of rights of custody attributed to a person . . . under the law of *the State* in which the child was habitually resident immediately before the . . . retention . . . ." (emphasis added)); *see also* 22 U.S.C. § 9003(f)(1) ("[T]he term 'authorities', as used in article 15 of the Convention to refer to the authorities of *the state* of the habitual residence of a child . . . ." (emphasis added)). Such language is not susceptible to any construction whereby a child may have more than one habitual residence country at a time. *See In Marriage of Hanbury-Brown* (1996) 130 FLR 252, 285 (Austl.)[17]; Rhona Schuz, *Policy Considerations in*

---

[17] "In interpreting any treaty, '[t]he opinions of our sister signatories . . . are entitled to considerable weight.'" *Abbott*, 560 U.S. at 16 (alterations in original) (internal quotation marks omitted) (quoting *El Al Israel Airlines, Ltd. v. Tsui Yuan Tseng*, 525 U.S. 155, 176 (1999)). "The principle applies with special force here, for Congress has directed that 'uniform international interpretation of the Convention' is part of the Convention's framework." *Id.* (quoting former 42 U.S.C. § 11601(b)(3)(B)). Accordingly, we consider the "views of other contracting states," as expressed in "international case law," in interpreting the Hague Convention. *Id.*

*Determining the Habitual Residence of a Child and the Relevance of Context*, 11 J. Transnat'l L. & Pol'y 101, 126 (2001); *cf.* Linda Silberman, *Interpreting the Hague Abduction Convention: In Search of a Global Jurisprudence*, 38 U.C. Davis L. Rev. 1049, 1067 n.78 (2005).

This textual conclusion finds support in the Convention's Explanatory Report, which is "generally recognized as 'the official history and commentary on the Convention.'" *Whiting v. Krassner*, 391 F.3d 540, 546 n.3 (3d Cir. 2004) (quoting Legal Analysis, *supra*, at 10503); *accord Feder*, 63 F.3d at 221 n.7. The Explanatory Report similarly makes clear that a child may have only one habitual residence country at a time:

> The practical application of [the wrongful retention] principle requires that the signatory States be convinced that they belong, despite their differences, to the same legal community within which the authorities of each State acknowledge that the authorities of *one of them*—those of the child's habitual residence— are in principle best placed to decide upon questions of custody and access.

Elisa Pérez-Vera, Explanatory Report ¶ 34, in 3 Hague Conference on Private International Law, Acts and Documents of the Fourteenth Session 434–35 (1982) (emphasis added).

Thus, it is unsurprising that the overwhelming majority of United States cases that have addressed the issue have concluded that a child may have only one habitual residence country at a time. *See, e.g.*, *Sorenson v. Sorenson*, 559 F.3d

18

871, 873 (8th Cir. 2009) ("[A] person may have only one habitual residence." (quoting *Silverman v. Silverman*, 338 F.3d 886, 898 (8th Cir. 2003) (en banc))); *Robert v. Tesson*, 507 F.3d 981, 989 (6th Cir. 2007) (same); *Miller v. Miller*, 240 F.3d 392, 400 (4th Cir. 2001) (same).[18] Foreign cases addressing the issue have reached the same conclusion. *See, e.g.*, *In Marriage of Hanbury-Brown* (1996) 130 FLR 252, 285−86 (Austl.) ("[T]he notion of [concurrent] habitual residence is simply inconsistent with the wording of the Convention, and with all known judicial pronouncements upon it."); Kaniuch v. Pontes, 2004 CarswellAlta 1922, para. 14 (Can. Alta. Q.B.) (WL); Re V (Abduction: Habitual Residence) (1995) 2 FLR 992, 1001−02 (Eng.); Cameron v. Cameron (1996) SC 17 (Scot.).[19]

Courts have not strayed from this bedrock principle even where a child has meaningful connections to two

---

[18] *Accord Panteleris v. Panteleris*, 30 F. Supp. 3d 674, 682 (N.D. Ohio 2014) (same); *Blanc v. Morgan*, 721 F. Supp. 2d 749, 760 (W.D. Tenn. 2010) (same); *In re Morris*, 55 F. Supp. 2d 1156, 1161 (D. Colo. 1999) (same); *Freier v. Freier*, 969 F. Supp. 436, 440 (E.D. Mich. 1996) (same); *cf. Tsai-Yi Yang*, 499 F.3d at 272 ("[A] child's prior habitual residence must be effectively abandoned by the shared intent of the parents for her to acquire a new habitual residence."); *Whiting*, 391 F.3d at 550 (same).

[19] *Accord* Maharaj v. Maharajh, 2011 ONSC 525, para. 13 (Can.); Wilson v. Huntley, 2005 CarswellOnt 1606, para. 57 (Can. Ont. Sup. Ct. J.) (WL); S.-C. (S.) v. C. (G.), 2003 CarswellQue 2223, para. 53 (Can. Que. Ct. Sup.) (WL); Dickson v. Dickson (1990) SCLR 692 (Scot.).

countries. For example, in shuttle custody situations, a child spends a roughly equal amount of time in two countries because her parents, who live in different countries, agree to split custody. *See supra* note 6. In a recent shuttle custody case, rather than considering the possibility of concurrent habitual residence, the Ninth Circuit adopted the theory of alternating habitual residence whereby a child's habitual residence alternates between those two countries.[20] *Valenzuela v. Michel*, 736 F.3d 1173, 1178−79 (9th Cir. 2013).

---

[20] As the Ninth Circuit noted, foreign cases have similarly adopted the theory of alternating habitual residence. *See* In re CL (a minor) and In re the Child Abduction and Custody Act 1985; JS v. CL (unreported High Court N. Ir. Aug. 25, 1998) ("[T]he child was habitually resident in whichever jurisdiction he was living for a particular week."); Maharaj v. Maharajh, 2011 ONSC 525, para. 13 (Can.); Wilson v. Huntley*,* 2005 CarswellOnt 1606, para. 32 (Can. Ont. Sup. Ct. J.) (WL); In re A. (1998) 1 FLR 497 (Eng.); Re V (Abduction: Habitual Residence) (1995) 2 FLR 992, 1001−02 (Eng.); *cf.* Watson v. Jamieson (1998) SLT 180 (Scot.).

Although we need not examine the propriety of alternating habitual residence in this case, we note that alternating habitual residence comports with the text of the Hague Convention because, under that theory, a child has only one habitual residence country at any given time.

In concluding that concurrent habitual residence is possible under the Convention, the District Court relied on an earlier Ninth Circuit decision—*Mozes v. Mozes*, 239 F.3d 1067 (9th Cir. 2001). In *Mozes*, the Ninth Circuit observed in dicta that, although "the view held by many courts" is that "a person can only have one habitual residence at a time under the Convention," "[t]he exception would be the rare situation where someone consistently splits time more or less evenly between two locations, so as to retain *alternating habitual residences* in each." *Id.* at 1075 n.17 (emphasis added). The Court went on to observe that, if "[a] child . . . spent regularly alternating periods with each parent," the child "might . . . acquire[] *dual habitual residences*." *Id.* at 1083 n.50 (emphasis added). In support of its observations, the Court cited to a commentator that advocates for the possibility of *concurrent habitual residence*—Paul R. Beaumont & Peter E. McEleavy, *The Hague Convention on International Child Abduction* 110 (1999).

After carefully reviewing *Mozes*, it is not clear to us whether the Ninth Circuit was endorsing concurrent habitual residence or alternating habitual residence in that case.[21] The Ninth Circuit's later opinion in *Valenzuela* appears to interpret *Mozes* to have endorsed alternating habitual residence. *See Valenzuela*, 736 F.3d at 1177−79. However,

---

[21] We are particularly confused by the Ninth Circuit's statement that the "exception" to a child having "one habitual residence at a time" would be "alternating habitual residences." *Mozes*, 239 F.3d at 1075 n.17. In an alternating habitual residence scenario, the child's habitual residence alternates between two countries such that the child does, in fact, have only one habitual residence country at a time.

21

to the extent that *Mozes* can be read to support concurrent habitual residence, we reject that interpretation of the Hague Convention as inconsistent with the Convention's unambiguous text.

We are mindful that, in cases where a child has meaningful connections to two countries, the determination of which is the child's habitual residence may sometimes be difficult. However, that is the determination required by the text of the Hague Convention.[22] Courts are permitted only to interpret existing treaty provisions—not re-draft those provisions. *See Lozano v. Montoya Alvarez*, 134 S. Ct. 1224,

---

[22] Permitting concurrent habitual residence would also introduce a fundamental problem into the structure of the treaty—in cases where the custody laws of two concurrent habitual residence countries conflict, how would a court determine which country's laws to apply in determining whether a wrongful retention had taken place? Given that the Convention clearly contemplates a child having only one habitual residence country at a time, it provides no choice of law rule for such a situation. *But see* Beaumont & McEleavy, *supra*, at 110 (suggesting a theoretical solution to this problem).

Despite finding that the children in this case were habitually resident in both Dutch Sint Maarten and French Saint Martin at the same time, the District Court avoided this choice of law problem by analyzing Didon's custody rights only under French law. It did not provide any justification for ignoring Dutch custody law, which would have equal application to the wrongful retention inquiry in a concurrent habitual residence scenario.

1235 (2014). "[T]o alter, amend, or add to any treaty, by inserting any clause, whether small or great, important or trivial, would be on our part an usurpation of power, and not an exercise of judicial functions. It would be to make, and not to construe a treaty."[23] *Chan*, 490 U.S. at 135 (alteration in original) (internal quotation marks omitted) (quoting *In re The Amiable Isabella*, 19 U.S. (6 Wheat.) at 22). Therefore, remaining faithful to the text of the treaty, we hold that a child may have only one habitual residence country at a time under the Hague Convention.

**B.** *The Children's Habitual Residence Country is Dutch Sint Maarten*

Given our conclusion that the Convention does not permit concurrent habitual residence, we must now determine in which country the children were habitually resident— Dutch Sint Maarten or French Saint Martin.

The Hague Convention does not define the phrase "habitual residence." *See Feder*, 63 F.3d at 222. However, we interpret the words of treaties in accordance with their ordinary meaning. *See Santovincenzo v. Egan*, 284 U.S. 30,

---

[23] This principle holds true even if one views the Convention's failure to address concurrent habitual residence as a "gap" or "oversight" rather than a conscious choice that a child may have only one habitual residence country at a time. *See Chan*, 490 U.S. at 135 ("Neither can this Court supply a *casus omissus* in a treaty, any more than in a law." (quoting *In re The Amiable Isabella*, 19 U.S. (6 Wheat.) 1, 22 (1821))).

40 (1931); *Abbott*, 560 U.S. at 11; *In re B. Del C.S.B.*, 559 F.3d 999, 1010 (9th Cir. 2009). "Habitual residence" is defined as "[a] person's customary place of residence." *Habitual Residence*, Black's Law Dictionary (10th ed. 2014). We therefore look to the ordinary meaning of the term "residence," which is incorporated into the phrase "habitual residence" as a matter of language and definition. *See Koch v. Koch*, 450 F.3d 703, 712 (7th Cir. 2006); *Guzzo v. Cristofano*, 719 F.3d 100, 106 & n.5 (2d Cir. 2013); *Simcox v. Simcox*, 511 F.3d 594, 602 (6th Cir. 2007). "Residence" is defined as "[t]he place where one actually lives," or, put another way, where one has a home. *Residence*, Black's Law Dictionary (10th ed. 2014); *Residence*, Merriam-Webster Dictionary Online, http://www.merriam-webster.com/dictionary/residence (last visited Sept. 23, 2016); *see Live*, Merriam-Webster Dictionary Online, http://www.merriam-webster.com/dictionary/live (last visited Sept. 23, 2016).

In our view, it would disregard the ordinary meaning of the term "residence" to find that a child is habitually resident in a country in which she has not "lived." Consider, for example, a child whose home is in New Jersey but who travels to New York each day to attend elementary school and engage in various other daily activities. On those facts, regardless of how much time the child spent each day in New York, an ordinary person would not say that the child is a "resident" of New York—a state in which she does not live. *See In re B. Del C.S.B.*, 559 F.3d at 1011. Indeed, the parties have not pointed us to any case in which a child was found to

24

be habitually resident in a country in which she had not lived.[24]

Although drawing such a distinction between two relevant countries may seem somewhat arbitrary, it is the result of a difficult choice of law question faced by the drafters of the Hague Convention: how to determine which country's custody law to apply where two countries have a potential interest in the application of their own custody law. The drafters of the Convention decided to resolve this question by according priority to the country of "habitual residence," believing authorities in that country to be "in principle best placed to decide upon questions of custody and access." Pérez-Vera, *supra*, ¶ 34 at 434–35. Such distinctions are common in conflict of laws analyses, which often resolve difficult choice of law questions by reference to rules viewed as predictable and easy-to-apply. *See generally* Kermit Roosevelt, *Conflict of Laws* 3−32 (2010) (examining the territorial theory of the Restatement (First) of Conflict of Laws under which the law of the location of a legal event generally governs).[25] In following the ordinary meaning of

---

[24] We note that, in all our Hague Convention cases in which we examined a district court's determination as to where a child was habitually resident, the child had lived in the purported habitual residence countries. *See Tsai-Yi Yang*, 499 F.3d at 266−67; *Karkkainen*, 445 F.3d at 285−86; *In re Application of Adan*, 437 F.3d 381, 386 (3d Cir. 2006); *Whiting*, 391 F.3d at 542−43; *Feder*, 63 F.3d at 218−20.

[25] The drafters of the Hague Convention could have adopted, instead of a "habitual residence" rule, an interest analysis standard, under which a court would examine the interest of the relevant countries in the application of their

the term "residence" and requiring that a child have lived in a country for a finding of habitual residence, we are honoring the choice of law rule provided by the drafters of the Convention.

The adoption of a "living" requirement for habitual residence also fits harmoniously within existing habitual residence jurisprudence. Such a requirement is consistent with principles of habitual residence to which we have looked in the past. *See Whiting*, 391 F.3d at 547 ("All that is necessary is that the purpose of *living where one does* has a sufficient degree of continuity to be properly described as settled." (emphasis added) (quoting *Feder*, 63 F.3d at 223)); *In re Application of Adan*, 437 F.3d at 392 (same); *Delvoye v. Lee*, 329 F.3d 330, 334 (3d Cir. 2003) ("Where a child is born while his . . . mother is temporarily present in a country other than that of her habitual residence . . . the child will normally have no habitual residence until *living in a country* on a footing of some stability." (first alteration in original) (emphasis added) (quoting Dr. E.M. Clive, *The Concept of Habitual Residence*, The Jurid. Rev. part 3, 138, 146 (1997)). It is also consistent with cases from other courts. *See Guzzo*, 719 F.3d at 106 (defining habitual residence as "the place where [a child] usually or customarily *lives*" (emphasis

own custody law. *See generally* Roosevelt, *supra*, at 41–79. While such an approach might appear more appealing in this particular case given the meaningful connections of the children to both Dutch Sint Maarten and French Saint Martin, the drafters did not choose this choice of law approach and we must respect their decision.

added)); *Barzilay v. Barzilay*, 600 F.3d 912, 921 (8th Cir. 2010) (observing that an agreement between two parents purporting to set a child's habitual residence in a country where the child has "never lived" would be ineffectual). Moreover, in a typical Hague Convention case where a child is moved from one country to another and a court must determine which is her habitual residence, *see Valenzuela*, 736 F.3d at 1177−78, the child has lived in both countries and so the requirement would be satisfied no matter which country the court determines to be the child's habitual residence.

We therefore conclude that a child must have lived in a country before that country can be considered her habitual residence under the Hague Convention. We take this opportunity to outline the analytical structure that courts should use in determining a child's habitual residence country.

In answering the question of where a child is habitually resident, we have traditionally followed several principles. "The inquiry into a child's habitual residence is a fact-intensive determination that cannot be reduced to a predetermined formula and necessarily varies with the circumstances of each case." *Karkkainen*, 445 F.3d at 291. As a general matter, a child's habitual residence is "the place where [the child] has been physically present for an amount of time sufficient for acclimatization and which has a degree of settled purpose from the child's perspective." *Baxter v. Baxter*, 423 F.3d 363, 368 (3d Cir. 2005) (internal quotation marks omitted) (quoting *Feder*, 63 F.3d at 224). "This approach considers a child's experience in and contacts with her surroundings, focusing on whether she 'develop[ed] a certain routine and acquire[d] a sense of environmental

normalcy' by 'form[ing] meaningful connections with the people and places [she] encountered' in a country prior to the retention date." *Karkkainen*, 445 F.3d at 292 (alterations in original) (quoting *Whiting*, 391 F.3d at 550–51). We also "consider the 'parents' present, shared intentions regarding their child's presence [in a particular location],'" *Tsai-Yi Yang*, 499 F.3d at 272 (alteration in original) (quoting *Baxter*, 423 F.3d at 368), especially "[w]hen a child is too young to have an intent regarding her habitual residence," *In re Application of Adan*, 437 F.3d at 392.

Within this framework, the living requirement logically comes before any question of where a child is "acclimatized" or the "shared intentions" of her parents—it is a prerequisite to a finding of habitual residence. A court adjudicating a Hague Convention petition should first ask whether the child at issue has lived in the purported habitual residence countries. If that requirement is satisfied for those countries, the court should then engage in the fact-intensive inquiry laid out in the preceding paragraph. Viewed in this way, the living test is used to determine whether a child has multiple *residence* countries, and the fact-intensive inquiry is used to determine, among those residence countries, which is the child's *habitual* residence.

In this case, although the children attended school in French Saint Martin, it is clear that the country in which they lived (*i.e.*, had a home) was Dutch Sint Maarten.[26] Because

---

[26] As we observe *supra* note 8, the District Court found that Didon owned a two-unit apartment building in French Saint Martin. However, the testimony credited by the District Court made clear that the family stayed there together only five or six times a year and so the children did not live in

28

there is only one country in which the children lived, our analysis is complete and we need not proceed to the fact-intensive inquiry. We hold that the children were habitual residents of Dutch Sint Maarten alone. Because Dutch Sint Maarten does not recognize the Hague Convention,[27] the Convention does not apply to this case and the petition must be dismissed.[28] *See* Hague Convention, *supra*, at arts. 4 & 35.

## VI.   CONCLUSION

For the foregoing reasons, we will vacate the District Court's judgments and dismiss the petition. We will also instruct the District Court to order that A.D. be returned to the United States forthwith. The Clerk of Court will issue the mandate immediately.

---

French Saint Martin. Indeed, the District Court found that "[p]rior to Dominguez's departure with the children, the family unit had been living together [in Dutch Sint Maarten] since A.D.'s birth in 2010." App. vol. I at 21.

[27] *See supra* note 5 and accompanying text.

[28] Our dismissal of the petition is not limited to Dominguez's appeal of the District Court's grant of the petition as to A.D. Because the Hague Convention does not apply to this case, our dismissal must also extend to Didon's appeal of the District Court's denial of the petition as to J.D.