**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 16-3667
_____

CHARLES WESLEY BLACKLEDGE,
                                        Appellant
v.

OLGA GRIGORIEVNA BLACKLEDGE
_____

On Appeal from the United States District Court
for the Western District of Pennsylvania
(W.D. Pa. No. 2-16-cv-01004)
Honorable Nora B. Fischer, District Judge
_____

Argued: May 19, 2017

Before: AMBRO, KRAUSE, and NYGAARD, *Circuit Judges*

(Opinion Filed: August 3, 2017)

James C. Martin, Esq.
Reed Smith
225 Fifth Avenue, Suite 1200
Pittsburgh, PA 15222

Michael P. Yingling, Esq. (Argued)
Reed Smith
10 South Wacker Drive, 40th Floor
Chicago, IL 60606

*Attorneys for Petitioner-Appellant[1]*

Barbara B. Ernsberger, Esq. (Argued)
Behrend & Ernsberger
355 Fifth Avenue
Suite 1200, Park Building
Pittsburgh, PA 15222

*Attorney for Respondent-Appellee*

_____

OPINION OF THE COURT
_____

KRAUSE, Circuit Judge.

Petitioner, a German resident, appeals the denial of his petition alleging that his wife wrongfully retained their then-eight-year-old son in the United States in violation of the Hague Convention on the Civil Aspects of International Child

---

[1] We express our gratitude to Appellant's counsel for accepting our appointment of this matter and for their excellent briefing and argument in this case. Lawyers who act *pro bono* fulfill the highest service that members of the bar can offer to indigent parties and to the legal profession.

Abduction. Because we conclude that, to the extent an agreement between the parties can be gleaned from the record, the parents' shared intent was that the child would move to the United States not for a transient visit, but with a settled purpose, and because the child had acclimatized to his life in the United States at the time of the retention, the United States was then his habitual residence and the retention was not wrongful under the Convention. Accordingly, we will affirm.

## I.  Factual Background

### A.  J.B.'s Early Years and Initial Two-Year Residence in Pittsburgh

J.B., a United States citizen, was born in the Ukraine in 2008 to Petitioner Charles Blackledge, a United States citizen who currently resides in Berlin, Germany, and Respondent Olga Blackledge, a Ukrainian citizen and lawful permanent resident of the United States who currently resides in Pittsburgh, United States. For the first three years of J.B.'s life, the family lived in Kharkiv, Ukraine, and Dublin, Ireland, while also spending some weeks in Vilnius, Lithuania. In the spring of 2011, when the family was staying in Lithuania and then Ukraine, Petitioner secured a job as a patent agent in Germany at about the same time Respondent was accepted to a Ph.D. program at the University of Pittsburgh. The family left Ukraine and, after a seven-week summer holiday in Munich, Germany, Respondent and J.B. moved to Pittsburgh and lived for the next two years separately from Petitioner, who lived and worked in Berlin, Germany, while regularly visiting and communicating with J.B. According to Petitioner, the plan was for the family to eventually reunite—either Respondent would finish her

3

coursework in Pittsburgh and go to Germany or Petitioner would use his position in Germany "as a stepping stone to get back to the [United States]." J.A. 240.

In the summer of 2013, after Respondent and J.B. had lived in Pittsburgh for two years, J.B. underwent cardiac surgery at the Children's Hospital in Pittsburgh. Petitioner went to Pittsburgh to be with J.B. during his recuperation and to seek jobs in the United States. When those efforts proved fruitless, Petitioner decided to return to Germany and Respondent agreed to join him, both because she had agreed, before the initial move to Pittsburgh, to move to Germany for two years and because she was financially unable to support herself at that point. Respondent then arranged for storage of toys, books, furniture, and other belongings with a friend in Pittsburgh, and Petitioner, Respondent, and J.B. moved together to Berlin, Germany, in August 2013. For J.B., this was the first time he had ever been to Berlin or ever resided in Germany.

## B. J.B.'s Move to Germany

After the move, Respondent continued to pursue her Ph.D. studies at the University of Pittsburgh, remotely, and J.B. was enrolled in the J.F.K. School, a public school "founded in conjunction [with the] American Embassy and German Government" with a "bilingual/bicultural" focus, intending to provide American students with an "easier time to adjust to the[ir] German" residency while still "preserv[ing] their language and continu[ing] to work on their language skills and all of the subjects in English." J.A. 430-31. J.B. also attended an afterschool program at J.F.K., where students could play and do their homework, joined a soccer team, and played chess at the Russian House.

4

In August 2015, when J.B. was seven years old, Respondent sought to return to Pittsburgh to complete the final phase of her Ph.D. program. By this point, according to both parties, the marriage had become acrimonious, and, according to Respondent, they had "agreed that [they would] divorce" and that it was only "a matter of time [as to] when." J.A. 421-22. While the nature of the parties' disagreement over J.B.'s continued residence underlies this appeal and will be discussed in more detail below, Petitioner initially agreed that Respondent and J.B. would return to Pittsburgh, and they requested a one-year leave of absence for J.B. from the J.F.K. School and secured German visas for themselves and J.B. that were valid through 2018. Given the belongings they had stored in Pittsburgh in August 2013, Respondent and J.B. opted to leave in Germany items that were difficult to transport, such as toys, Legos, and a bike, when they returned to Pittsburgh in August 2015.

## C.  J.B.'s Return to Pittsburgh

Back in Pittsburgh, J.B. attended second grade in the 2015-2016 school year and, according to his teacher, "performed as a wonderful second grader," earning, cumulatively, at the end of the year As in spelling, handwriting, math, and grammar, and a B in reading, and finishing the year on "academic high honor roll." J.A. 328-30. J.B.'s teacher described him as a "well-behaved" child who "followed rules and routines easily," "made friends easily," J.A. 330, was "[k]ind, happy, loving, eager to learn," and was generally "well-adjusted," J.A. 334. Despite an initial deficiency in reading, J.B. finished the fourth quarter with "an excellent grade," showing what his teacher termed "dramatic improvement" in his reading level throughout the year. J.A. 333, 451. J.B.'s love of reading extended beyond

5

the school year, when J.B. joined a summer reading challenge, completing the fifteen-book assignment by July 5, two months ahead of the August 31 deadline.

J.B. was also a member of a four-student robotics club, organized by a parent of one of his classmates. The team met every Saturday or Sunday afternoon when the students would design missions and submit the mission to a robotics competition, winning first place in Pennsylvania and twenty-ninth in the United States. J.B. was tentative at first, because he didn't know how to program the robot and thought the tasks were "impossible," but by the end "he was . . . so excited" by the project, and he was able to explain his favorite mission and how the students accomplished it. J.A. 355-56. J.B. and the classmate whose mother had organized the robotics club "stayed friends after the robotic project" ended, playing Legos and soccer together. J.A. 358.

In addition, J.B. bonded with his teammates on his swim team, which ran for three trimesters—from September through December, January through April, and May through July. The goal for students on the team was to master the four competitive strokes so that they would be able to do them "correctly if they decide[d] to compete." J.A. 369-70. At the start of the year, J.B. was "able to swim the length of the pool free style" and had "a pretty good breast stroke kick, but his endurance—swimming the length of the pool was difficult." J.A. 371. By spring, however, he was able to compete in four meets, "better[ing] his times pretty much every meet" and, by summer, "he was able to swim all four strokes," do "flip turns," and "dive." J.A. 371-72.

J.B. made many friends in Pittsburgh and enjoyed play dates, birthday parties, video-gaming, playing soccer, playing

6

card games, sleepovers, and other outings with various young people. J.B.'s own birthday party, when he turned eight in June 2016, was attended by many of those friends. Respondent's friends and colleagues also developed a bond with J.B., enjoying dinners together, attending university events and spending weekends and holidays together, going to the park, attending theater festivals and puppet shows together, and generally playing with and babysitting J.B.

Respondent and J.B. also explored the broader Pittsburgh environs, including trips to Erie, Pennsylvania, Frank Lloyd Wright's Fallingwater in Mill Run, Pennsylvania, and Pittsburgh's four Carnegie Museums. They also became members of a local museum called the Mattress Factory where J.B. enjoyed "showing off his knowledge . . . to his friends," whom he sometimes invited to join him. J.A. 446-47. J.B.'s interests extended as well to sports, and he became familiar with the local sports teams and was a fan of the Pittsburgh Penguins hockey team and the Riverhounds soccer team.

### D. Parents' Dispute Over J.B.'s Continued Residence

Within the first month of J.B.'s stay in the United States, Petitioner sent Respondent an email, referencing job applications he had sent to the United States and elsewhere, and indicating that he might be moving to another country so that J.B. would not be returning to Germany at all. Respondent assured Petitioner that J.B. "is pretty happy in Pittsburgh, so by the end of the year, going back to Berlin might not be exactly what he wants." J.A. 199. Petitioner replied to this email but did not comment on, or reject, the possibility of J.B. remaining in Pittsburgh.

7

However, five months later, in February 2016, Petitioner initiated a series of emails with Respondent that form the bulk of the record of the parties' shared intent as to J.B.'s habitual residence. These began with Petitioner's request that Respondent "confirm [her] commitment to our agreement" that J.B. would return to Germany for the 2016-17 academic year. J.A. 188-90. For her part, the Respondent did not deny the existence of an agreement but asked the Petitioner to "reconsider it," J.A. 172, explaining, "I do not think . . . it is a good idea for a child [J.B.'s] age to live with one parent for a year, and with the other for a year," J.A. 181. That agreement, Respondent stated, "presupposes . . . yearly adaptation to living with different parents [which] is psychologically disadvantageous" to J.B., and urged Petitioner to consider J.B.'s well-being, J.A. 177, suggesting that Petitioner move "somewhere close" so that they could both "take care of [J.B.] on a permanent basis" and not "change [J.B.'s] permanent caregiver every year." J.A. 181.

In response, Petitioner observed that Respondent had not expressed any concerns about J.B. "spend[ing] alternate years with us when the agreement was made." J.A. 178. And while Petitioner acknowledged Respondent's "concerns about stability of dwelling," he explained that he did not "think there [we]re better options than maintaining [their] previous agreement," J.A. 179 (emphasis omitted), which he characterized as: "[J.B.] would go with you to Pitt[sburgh] and return to me for 2016-2017 academic year. Then back to you . . . ." J.A. 176. In subsequent correspondence, Petitioner advised Respondent to "prepare [herself] for fulfillment of [the] agreement that [J.B.] returns to [Respondent] for 2016-2017," reassuring her, "You'll have him again in 2017," J.A. 168. And in May, the parties again

8

discussed the prospect of J.B. alternating years between his parents, with Petitioner documenting in his notes of their call that Respondent continued to oppose "any plan for [J.B.] to alternate between Germany and [the] USA," because she believed that it "put[] too much pressure on [J.B.] to go back and forth" and "insist[ed] upon more consistency." J.A. 156-58.

While the dispute between the parties over J.B.'s long-term residency arrangements was ongoing, Respondent filed petitions for divorce and custody and, at the end of May, the Family Court in Allegheny County, Pennsylvania issued an interim custody order that, in terms of physical custody, allowed J.B. to continue to reside with the Respondent, pending a final custody determination, and granted Petitioner visitation over the summer and holidays.

On June 9, Petitioner informed Respondent that he had found a good rate for J.B. to return to Berlin on June 19 and that he wanted J.B. to stay in Berlin and go to school there "like we planned." J.A. 144. Respondent objected on the grounds that, under the interim custody order, any trip to Berlin would only be for a visit, not for the school year, and that J.B., in any event, was committed through August 3 to attend robotics and other summer camps, which Petitioner had not told her to cancel and for which the cancellation deadline had then passed.

Declaring that the interim custody order was "not valid," Petitioner "demand[ed] that [J.B.] return on 19 June," J.A. 143, and reiterated that he was looking at tickets for both Respondent and J.B., even though Respondent objected that ". . . it sounds like you are planning to abduct [J.B.]," and that Petitioner should "contest the court's decision . . . legal[l]y,"

9

J.A. 143. After a few additional exchanges in which Respondent sought assurance from Petitioner about the length of J.B.'s visit before she would consent to his return to Germany, Petitioner stated that he was "still waiting to hear anything more from the mediators." J.A. 140. The record reflects no additional email communications between the parties.

On July 6, 2016, Petitioner filed a petition in the United States District Court for the Western District of Pennsylvania, seeking J.B.'s return to Germany under the Hague Convention.

## II. District Court Proceedings

The District Court held a two-day bench trial in mid-August.[2] In addition to the above-referenced emails and the testimony of Petitioner and Respondent, the trial record included testimony and documentation offered by J.B.'s teacher, swim coach, parents of J.B.'s school friends, and Respondent's friends, related to J.B.'s acclimatization to Pittsburgh, as well as written statements from Petitioner's brother and friends and acquaintances in Germany, indicating they understood that J.B. was to return to Germany for the

_____

[2] Prior to the hearing, the parties were referred to mediation. Unfortunately, mediation was unsuccessful. While mediation enables parents, who are well-positioned to know the needs of their child, to forge a resolution that best serves the child's interests, a court reviewing a Hague Convention petition has the more limited mandate of "restor[ing] the status quo that existed prior to the wrongful . . . retention." *Didon v. Dominguez Castillo*, 838 F.3d 313, 320 (3d Cir. 2016) (internal quotation marks omitted).

2016-2017 school year. With regard to the testimony of Petitioner and Respondent, the District Court found Respondent generally to be more credible. Of the written statements offered by Petitioner, only one was based on a conversation in which Respondent was present, and the rest were based on Petitioner's representations to the declarants. The District Court accorded these statements "diminished weight" and "minimal significance," on the grounds that they were "the product of a concerted effort by Petitioner" and that "several" of the letters "merely . . . parrot[ed] language directly suggested by Petitioner." *Blackledge v. Blackledge*, No. 16-1004, 2016 U.S. Dist. LEXIS 114543, at *22 (W.D. Pa. Aug. 26, 2016). The District Court also conducted an *in camera* interview of J.B.

On August 19, 2016, the District Court entered an order denying the petition, and on August 26, 2016, it issued a Memorandum Opinion in support of its order.[3] *See id.* at *1. Its first order of business was to determine the retention date so that it could then consider which forum was J.B.'s habitual residence immediately prior to that date. Reasoning

---

[3] Because the District Court concluded Petitioner did not meet his burden to prove he was entitled to relief, it did not address any of the affirmative defenses raised by Respondent, which included that J.B. had attained the age and maturity at which it was appropriate to take account of his preferences, that J.B. preferred to remain in Pittsburgh, and that returning to Germany would expose J.B. to a grave risk of harm. *See* Hague Convention on the Civil Aspects of International Child Abduction art. 13, Oct. 25, 1980, T.I.A.S. No. 11,670; *Blackledge*, No. 16-1004, 2016 U.S. Dist. LEXIS 114543, at *7-15.

11

that Petitioner himself testified he originally agreed to permit J.B. to live in Pittsburgh for one year, starting in August 2015, and that Petitioner had acquiesced to J.B. participating in camps through the summer, the District Court calculated the retention date as August 2016. *Id.* at *10-11 & n.5.

Turning to the question of habitual residence, the District Court correctly recognized that it was required to consider both the parents' shared intent and the child's acclimatization. *Id.* at *11-12; *see Karkkainen v. Kovalchuk*, 445 F.3d 280, 291-92 (3d Cir. 2006). As to shared parental intent, it concluded there was "no credible evidence" that the parties agreed that J.B.'s stay would be for a "specific duration." *Blackledge*, No. 16-1004, 2016 U.S. Dist. LEXIS 114543, at *24. And, considering evidence of J.B.'s activities and expectations up until the August retention date, the Court concluded that J.B. was acclimatized to Pittsburgh. *Id.* at *12-17, *24. In so finding, it accorded "significant weight" to J.B.'s *in camera* interview, including his stated preference for Pittsburgh, because it found J.B. "to exhibit an unusual degree of maturity and situational awareness." *Id.* at *12 n.6, *15. As it concluded Pittsburgh was J.B.'s habitual residence immediately prior to the August retention date, the District Court held that the retention was not wrongful under the Hague Convention. *Id.* at *25. The consequence of this holding was that J.B. could continue to reside in Pittsburgh pending the resolution of his parents' custody proceedings before the Allegheny County Family Court. *See generally Karkkainen*, 445 F.3d at 287.

Petitioner now appeals, seeking to reverse the District Court's denial of his petition, with the understanding that a reversal would allow the Allegheny County interim custody order to be vacated, custody proceedings to be initiated in

Germany, and J.B. to reside with Petitioner in Germany pending the resolution of those proceedings.

## III. Jurisdiction and Standard of Review

The District Court properly exercised jurisdiction under 22 U.S.C. § 9003(a), which grants district courts original jurisdiction over claims arising under the Convention. We exercise jurisdiction under 28 U.S.C. § 1291.

We review the District Court's factual findings for clear error and review legal conclusions and the application of the law to the facts *de novo*. *Didon v. Dominguez Castillo*, 838 F.3d 313, 319-20 & n.13 (3d Cir. 2016). In the context of Hague Convention cases, certain determinations involve mixed questions of law and fact. We have held, for example, that habitual residence is a mixed question of law and fact. *Feder v. Evans-Feder*, 63 F.3d 217, 222 n.9 (3d Cir. 1995). And although our past cases have not addressed the issue in explicit terms, we recognize today that the two factors informing habitual residence, i.e., the parents' shared intentions regarding the child's move and the child's acclimatization, themselves involve mixed questions, because those factors depend both on case-specific fact-findings and whether those findings meet the specified legal threshold. *See Ornelas v. United States*, 517 U.S. 690, 696-97 (1996) (explaining that the "issue [of] whether the facts satisfy the [relevant legal] standard" is a mixed question of law and fact). For mixed questions of law and fact, we must "separate the issue into its respective parts, applying the clearly erroneous test to the factual component, [and] the plenary standard to the legal." *N. River Ins. Co. v. CIGNA Reinsurance Co.*, 52 F.3d 1194, 1218 (3d Cir. 1995).

13

## IV. Analysis

The purposes of the Hague Convention are "to secure the prompt return of children wrongfully removed to or retained in any Contracting State" and "to ensure the rights of custody and of access under the law of one Contracting State are effectively respected in the other Contracting States." Hague Convention on the Civil Aspects of International Child Abduction art. 1, Oct. 25, 1980, T.I.A.S. No. 11,670 [hereinafter Hague Convention]. The Convention was "not designed to resolve international custody disputes." *Karkkainen*, 445 F.3d at 287. Rather, in addressing Hague Convention petitions, courts are limited "to restor[ing] the status quo prior to any wrongful removal or retention, and to deter[ring] parents from engaging in international forum shopping in custody cases." *Id; see also Didon*, 838 F.3d at 320 (explaining that any return remedy merely "seeks to restore the status quo that existed prior to the wrongful . . . retention" (internal quotation marks omitted)).

A petitioner who initiates judicial proceedings for the return of a child under the Hague Convention has the burden to prove, by a preponderance of the evidence, that the child has been wrongfully removed or retained. 22 U.S.C. § 9003(b), (e)(1)(A). The removal or retention of a child is wrongful if:

> a    it is in breach of rights of custody attributed to a person . . . under the law of the State in which the child is habitually resident immediately before the removal or retention; and

14

b    at the time of removal or retention those rights were actually exercised . . . or would have been so exercised but for the removal or retention.

Hague Convention, *supra*, art. 3. As we have explained in interpreting these provisions, to determine if a petitioner is entitled to relief, the court must answer four questions: "(1) when the removal or retention took place; (2) the child's habitual residence immediately prior to such removal or retention; (3) whether the removal or retention breached the petitioner's custody rights under the law of the child's habitual residence; and (4) whether the petitioner was exercising his or her custody rights at the time of removal or retention." *Yang v. Tsui*, 499 F.3d 259, 271 (3d Cir. 2007) (citing *Karkkainen*, 445 F.3d at 287).

Here, as the District Court observed, there was no dispute as to the fourth factor, i.e., that Petitioner had custody rights under German law and that he was exercising those rights. But, having determined that the retention date was August 2016 and that J.B.'s habitual residence immediately prior to that date was Pittsburgh, the District Court concluded, on the basis of the first two factors, that Petitioner had not met his burden of proving a wrongful retention.[4] *Blackledge*, No. 16-1004, 2016 U.S. Dist. LEXIS 114543, at *10, *25.

Below we address, first, Petitioner's argument that the District Court erred in fixing the retention date, and, second,

---

[4] As to the third factor, Petitioner made no argument that the retention breached his custody rights under United States or German law. Instead, his argument focused on whether Germany still remained J.B.'s habitual residence at the time of the retention.

15

Petitioner's contention that it erred in determining J.B.'s habitual residence immediately prior to that date.

## A.    Retention Date

According to Petitioner, the District Court erred in adopting August 2016 as the retention date because Petitioner had withdrawn his consent to J.B. remaining in the United States prior to August, when he had "clearly communicate[d] [his] desire to regain custody" of J.B. in the June 9 email demanding J.B.'s return by June 19.  Appellant's Br. 21-22 (second alteration in original) (quoting *Karkkainen*, 445 F.3d at 290).  Respondent, for her part, urges us to adopt the District Court's August date.  We conclude neither June nor August reflects the proper date under our case law.

In *Karkkainen* we confronted a situation where the noncustodial parent initially agreed to the child remaining in the United States indefinitely, but then, in mid-July, emailed the custodial parent demanding that the child return home on August 10, the date for which she had purchased a return flight for the child, insisting that retention beyond that date would "constitute kidnapping." 445 F.3d at 289-90.  In determining the retention date, we recited, without adopting, another court's definition of "retention date" as the date the noncustodial parent "clearly communicates her desire to regain custody and asserts her parental right to have [her child] live with her."  *Id.* (alteration in original) (emphasis omitted) (quoting *Slagenweit v. Slagenweit*, 841 F. Supp. 264, 270 (N.D. Iowa 1993)).  Assuming this definition applied, we held that by mid-July the noncustodial parent had clearly communicated the withdrawal of consent for the child to remain in the United States beyond August 10 and that nothing in the record "suggest[ed] there was confusion about

[the noncustodial parent's] opposition after mid-July." *Id.* at 290. While we acknowledged that the noncustodial parent had originally agreed to let the child remain in the United States indefinitely, *id.* at 289, and had communicated in mid-July her withdrawal of that consent beyond August 10, we did not adopt the mid-July notice date as the retention date, *id.* at 290. Nor did we accept the notion that the original agreement for a longer period vitiated the noncustodial parent's ability to clearly communicate her desire to regain custody of the child. *Id.* Instead, we recognized that a party may accelerate a retention date by "withdraw[ing] her consent to have [the child] remain" with the custodial parent, and we then settled on August 10—i.e., the date on which consent actually expired—as the retention date. *Id.* at 290-91.

Building on *Karkkainen*, we hold that the retention date is the date beyond which the noncustodial parent no longer consents to the child's continued habitation with the custodial parent and instead seeks to reassert custody rights, as clearly and unequivocally communicated through words, actions, or some combination thereof. That determination is, by necessity, fact-intensive and will vary with the circumstances of each case. And while in some cases the notice date and actual expiration date will coincide, in other cases the notice will indicate a future date as the date consent will be withdrawn, in which case that latter date, depending on the facts of the case, will constitute the expiration date and, hence, the retention date.

In determining the retention date here, we conclude that the District Court erred by looking solely to Petitioner's original consent for J.B. to reside in Pittsburgh through August 2016 and failing to assess whether Petitioner's subsequent communications, up to and including the filing of

17

his Hague Convention petition, effected a withdrawal of that consent.[5] But, consistent with *Karkkainen*, we also reject Petitioner's argument in favor of a June 9, 2016 retention date, as that date reflects merely Petitioner's notice of a possible expiration of consent on June 19, 2016.

While in *Karkkainen* we rested on the prospective date of expiration identified in that petitioner's notice, *id.* at 290, significant differences between the facts of that case and this one lead us to conclude that June 19 also does not reflect the proper retention date here. In *Karkkainen* the noncustodial parent took the affirmative step of purchasing a ticket, asserted that any retention beyond the scheduled return date would constitute "kidnapping," and did not equivocate as to that retention date. *Id.* at 290. Here, in contrast, Petitioner only researched the possibility of purchasing a ticket; Respondent, not Petitioner, flagged a concern about "abduct[ion]," J.A. 143; and Petitioner left open the possibility of further negotiations, stating after his demand email that he was "still waiting to hear anything more from the mediators," J.A. 140. Under these circumstances, we conclude neither June 9 nor June 19 was the retention date, and in the absence of any earlier communication in which Petitioner clearly and unequivocally withdrew his prior consent and sought to reassert his custody rights, we hold that

---

[5] Indeed, given that the District Court purported to exercise jurisdiction over this case since the filing of the petition on July 6, 2016, an August 2016 retention date would raise concerns about the ripeness of Petitioner's claim and the jurisdiction of the federal courts to adjudicate it. *See generally Thomas v. Union Carbide Agric. Prods. Co.*, 473 U.S. 568, 579-80 (1985).

18

consent expired and J.B. was therefore "retained" on the date Petitioner filed his Hague Convention petition, i.e., July 6.

Below we consider the evidence concerning J.B.'s habitual residence immediately prior to that retention date and whether the District Court erred in its conclusions as to the parents' shared intent or J.B.'s acclimatization.

## B.      Habitual Residence

To determine where a child is habitually resident we "employ a mixed standard of review, accepting [a] district court's historical or narrative facts unless they are clearly erroneous, but exercising plenary review of the court's choice of and interpretation of legal precepts and its application of those precepts to the facts." *Didon*, 838 F.3d at 320 n.13 (alteration in original) (quoting *Feder*, 63 F.3d at 222 n.9). The Hague Convention does not define habitual residence, and we have held that it "is a fact-intensive determination that cannot be reduced to a predetermined formula and necessarily varies with the circumstances of each case." *Karkkainen*, 445 F.3d at 291. That inquiry becomes all the more difficult where "the petitioning parent initially agreed to allow the child to stay abroad for an indefinite duration, but subsequently had second thoughts about that decision." *Id.* Although a difficult inquiry, it is not without guideposts and our precedent assists us in navigating our path. Below we discuss (1) guiding principles from our case law relevant to habitual residence; (2) the record in this case concerning shared parental intent; and (3) the evidence of J.B.'s acclimatization.

## 1.      Principles of Habitual Residence

19

A child's habitual residence is "the place where [the child] has been physically present for an amount of time sufficient for acclimatization and which has a degree of settled purpose from the child's perspective." *Baxter v. Baxter*, 423 F.3d 363, 368 (3d Cir. 2005) (internal quotation marks omitted) (quoting *Feder*, 63 F.3d at 224). To assess whether a child's habitual residence meets this threshold we analyze both the child's acclimatization and the "shared parental intent"—a factor that is relevant because "the child's knowledge of [his parents'] intentions is likely to color [his] attitude to the contacts [he] is making" and "affect the length of time necessary for a child to become habitually resident or otherwise influence a child's ability to acclimatize," and, in addition, because it bears on the parents' own intentions "regarding their child's presence in a particular place."[6] *Karkkainen*, 445 F.3d at 292, 296 (internal quotation marks omitted).

As a general matter "courts will find no change in habitual residence" where the evidence of shared parental intent reflects that the "child's initial move from an established habitual residence was clearly intended to be for a specific, limited duration." *Whiting v. Krassner*, 391 F.3d 540, 549 (3d Cir. 2004). However, we have recognized an exception to this general rule where a move, though temporary, carries "a degree of settled purpose . . . , even if

---

[6] We give some "independent weight to the parents' present, *shared* intentions" to "ensure that neither parent is acting unilaterally to alter a joint understanding reached by the parents." *Karkkainen*, 445 F.3d at 292 (internal quotation marks omitted).

such purpose is only for a limited period." *Id.* The concept of "settled purpose," then, does not require an intention "to stay . . . indefinitely," and may in fact be for a "limited period," precipitated by various motivations, including "[e]ducation, business or profession, employment, health, family or merely love of the place." *Feder*, 63 F.3d at 223-24. Regardless of the motivation for the location selected, or whether the stay was meant to be permanent or temporary, "[a]ll that is necessary is that the purpose of living where one does has a sufficient degree of continuity to be properly described as settled." *Id.*

As to the relative weight given the parents' shared intent and the child's acclimatization, we have held that when a child is very young, he "cannot possibly decide the issue of residency," *Whiting*, 391 F.3d at 548, and the parents' shared intent is, thus, "of paramount importance," while acclimatization is secondary, *Karkkainen*, 445 F.3d at 296. However, once a child is old enough "to develop a certain routine and acquire a sense of environmental normalcy," acclimatization becomes the central inquiry. *Whiting*, 391 F.3d at 550-51. Although we have not fixed the age when acclimatization takes on this greater significance, and it necessarily will vary depending on the maturity and cognitive and social abilities of the child in question, we have recognized that a typical four-year-old child "certainly has this ability" because he is "able to develop a certain routine and acquire a sense of environmental normalcy" and is "not only aware of those around him, but is able to form meaningful connections with the people and places he encounters each day." *Id.* At that point, because the child has "reached an age where [he is] capable of becoming firmly rooted in a new country," we attach greater significance to

acclimatization and give "less weight to shared parental intent." *Karkkainen*, 445 F.3d at 296 (internal quotation marks omitted) (quoting *Holder v. Holder*, 392 F.3d 1009, 1119 (9th Cir. 2004)).

## 2. The Parents' Shared Intent In This Case

Here, the District Court declined to apply the presumption that there is, ordinarily, no change in habitual residence when the child's move is for a "specific, limited duration" because it found that there was "no credible evidence" that the parties had an agreement that J.B.'s stay in Pittsburgh would be for a "specific duration." *Blackledge*, No. 16-1004, 2016 U.S. Dist. LEXIS 114543, at *23-25 (quoting *Karkkainen*, 445 F.3d at 291 n.3). We agree with Petitioner that this finding was clearly erroneous, given the evidence on this record that there was such an agreement. But because that evidence overwhelmingly demonstrates the parties intended J.B.'s residence in Pittsburgh, albeit of specific, limited duration, to carry "a degree of settled purpose," *Whiting*, 391 F.3d at 549, we nonetheless conclude that the "shared parental intent" factor favors the United States as J.B.'s habitual residence.

At the outset, we cannot agree with the District Court that there was no credible evidence that the parties had agreed J.B.'s stay in Pittsburgh was intended to be for a specific duration. While the Court acknowledged that the record demonstrated the "existence of an agreement," it nonetheless found that it "does not speak to the specific terms of the agreement," *Blackledge*, No. 16-1004, 2016 U.S. Dist. LEXIS 114543, at *19, and therefore rejected the notion the stay could be categorized as of specific, limited duration. But we have not required great precision in the terms of the agreement, nor even a specific return date, in order to conclude a case involved an agreed-upon move of "specific, limited duration." *Whiting*, 391 F.3d at 549. Instead, we

23

have considered cases to fall in that category where the move was bounded by even a general time frame. *See Yang*, 499 F.3d at 272-73 (describing the child's residence with the father, intended to be for the length of the mother's recuperation, as "a limited period of time"); *Whiting*, 391 F.3d at 542, 549 & n.6 (discussing the child's stay with her mother for two years but "no later than October 19, 2003" as "intended to be for a specific, limited duration"); *see also Feder*, 63 F.3d at 223-24 (citing with approval *In re Bates*, No. CA 122-89, High Court of Justice, Family Div'l Ct. Royal Courts of Justice, U.K. (1989) (framing an approximately three-month stay with mother, while father was on a concert tour, as "for a limited period")).

Here, although the District Court was correct that the parties' emails stop short of identifying a date certain that was originally agreed for J.B.'s return, or similarly "specific terms of the agreement," *Blackledge*, No. 16-1004, 2016 U.S. Dist. LEXIS 114543, at *19, they make clear that the parties intended J.B.'s stay in Pittsburgh to be of a "specific, limited duration," *Whiting*, 391 F.3d at 549. For example, in response to Petitioner's references to the alleged "agreement" in his emails in February 2016, and his requests that Respondent "keep[] with [their] agreement that [J.B.] will return to [Petitioner] for the academic year 2016-2017," J.A. 190, Respondent did not reject the notion that there was an agreement or that J.B.'s stay with her in Pittsburgh was intended to be for a limited duration. Rather, she asked Petitioner to "reconsider" the agreement, J.A. 172, so that J.B. could stay with her "as a primary caregiver," J.A. 171, rather than requiring him to "yearly adapt[] to living" with a different parent in alternating years, which she believed would be "psychologically disadvantageous" for him, J.A.

24

177. Indeed, the record is replete with references to the parties' agreement that "[J.B.] would go with [Respondent] to Pitt[sburgh] and return to [Petitioner] for [the] 2016-2017 academic year. Then back to [Respondent]." J.A. 176; *see also* J.A. 168 (warning Respondent to "prepare [herself] for fulfillment of [their] agreement that [J.B.] returns to [Petitioner] for 2016-2017" and reassuring her, "You'll have him again in 2017"); J.A. 178 (noting that Respondent had not previously expressed concerns for J.B. to "spend alternate years with us when the agreement was made").

Notwithstanding such error, "we may affirm on any grounds supported by the record," *Maher Terminals, LLC v. Port Auth. of N.Y. & N.J.*, 805 F.3d 98, 105 n.4 (3d Cir. 2015), and "[w]hen the outcome is clear as a matter of law . . . remand is not necessary," *Mahmood v. Gonzales*, 427 F.3d 248, 253 (3d Cir. 2005). Here, we conclude such an outcome is clear as a matter of law because this case is on all fours with our decision in *Whiting v. Krassner*, 391 F.3d 540 (3d Cir. 2004).

In *Whiting*, the parents had agreed in writing, after the attack on the World Trade Center in New York City on September 11, 2001, that the mother and child would leave the United States and live in Canada for two years—i.e., for a limited duration. 391 F.3d at 542. Two months into the move, however, the father changed his mind and removed the child to the United States. *Id.* at 543. As the child there was only sixteen months old, *see id.* at 542-43, we focused on shared parental intent, and not acclimatization, and we concluded that the child's habitual residence was Canada, *id.* at 551-52. After observing the parties intended for the mother and child, albeit for that specified period, to put down roots and take on the normal pattern of residential life in Canada,

25

including renting an apartment near the mother's family members, looking into childcare programs, and applying for necessary documentation, such as a medical card, *id.* at 542, we concluded the move was accompanied by a "degree of settled purpose," *id.* at 549. Given that purpose, we observed, the fact that the mother and child's Canadian residence was planned for two years "d[id] not in any way diminish the parties' settled intention that the two were to remain in Canada for at least two years" and "in no way hinder[ed] the finding of a change in habitual residence." *Id.* at 550. In reaching our holding, we also rejected the father's argument that Canada could not have become the child's habitual residence because there was no shared intent to abandon the United States, and we recognized that "abandonment," as the flipside of "habitual residence," could also be for "a definite and extended period," *i.e.*, until the child resumed her habitual residence in the abandoned country, as scheduled.[7] *Id.*

In *Whiting*, we also relied heavily upon and cited approvingly to a British case that is even more analogous to J.B.'s case. *Id.* at 547 (citing *In re Bates*, No. CA 122-89, High Court of Justice, Family Div'l Ct. Royal Courts of Justice, U.K. (1989)); *see also Feder*, 63 F.3d at 222-24 (quoting *In re Bates*). There, the father was a musician who

---

[7] In *Whiting*, we held that Canada had become the child's habitual residence based only on the parties' shared intent. 391 F.3d at 550-51. Here, in contrast, not only the shared parental intent, but also acclimatization, favor the country of the custodial parent, *see infra* Part IV.B.3, making this an even stronger case for the United States as J.B.'s habitual residence.

travelled extensively, and the mother and child "had toured with father for the majority of the girl's life to that point." *Whiting*, 391 F.3d at 547 n.5. Though London "was the family's home base," the parents decided that the mother and daughter would live in New York while the father toured the Far East, but after only two days, the father directed the nanny to bring the girl back to London. *Id.* The court reasoned that the accommodations made in New York to which father had agreed, "however acrimoniously," for the three months before father "return[ed] to London amounted to a purpose with a sufficient degree of continuity to enable it properly to be described as settled." *Feder*, 63 F.3d at 224 (quoting *In re Bates*). The child's habitual residence, therefore, was New York. *Id.* at 223-24 (citing *In re Bates*).

Likewise, here, it is evident that J.B.'s move to the United States, although of limited duration, was intended by both Petitioner and Respondent to be accompanied by a degree of "settled purpose." *Whiting*, 391 F.3d at 550. The record reflects that J.B. moved to Pittsburgh in August 2015 for the purpose of assuming a full and normal life of an eight-year-old boy during the intended period of his stay, making long-term friends and plans, developing routines and a sense of environmental normalcy, exploring his city and other parts of the Commonwealth, and putting down roots, not only for the 2015-2016 school year, but also, per the parents' express agreement, for future alternating years, interspersed with the years he would be living with Petitioner in Germany. Under these circumstances, as in *Whiting*, the fact that the parties understood that J.B. would return to Germany "d[id] not in any way diminish . . . the parties' settled intention" that he was to remain in the United States for at least a year, settling into a normal routine, and the fact that J.B.'s stay was

intended to be of a limited duration "in no way hinder[ed]" a finding that the United States was his habitual residence during that time. *Id.*

Petitioner disputes this interpretation of the record, arguing that this case more closely resembles that addressed by the Ninth Circuit in *Mozes v. Mozes*, 239 F.3d 1067 (9th Cir. 2001). There the children, Israeli residents, traveled with their mother to the United States for a fifteen-month visit to "partake of American culture," *id.* at 1069, in what the court analogized to a "study[] abroad" program, *id.* at 1083. A year into that visit, however, the mother filed for divorce and retained the children in the United States. *Id.* at 1069. In rejecting the mother's argument that the United States had become the children's then-habitual residence, the Ninth Circuit concluded that, when the children moved to the United States, the "normal expectation," shared by both the parents and the children, was that the family would reunite in their home in Israel and that Israel would, therefore, remain their habitual residence. *Id.* at 1083. As the court explained, the parents and the children were Israeli citizens; they had lived all their lives in Israel and entered the United States on a temporary visa; and neither parent had a prior connection to the United States. *Id.* at 1069, 1082.

The record in J.B.'s case paints a very different picture. Petitioner and Respondent did not intend J.B.'s stay in Pittsburgh as a "study[] abroad" program or a transient "American cultur[al]" visit. *Id.* at 1069, 1083. On the contrary, when Respondent and J.B. moved to the United States, J.B. was returning to a country and culture with which he was already familiar and a city in which he had previously lived for two years—a city that, by the time of the retention date, was the longest and most stable residence he had known

28

in his fairly nomadic early years; in addition to having extended family in the United States, J.B. was a United States citizen, as was his father, and his mother was a lawful permanent resident; Respondent and J.B. had resided in Germany for only two years between their two residences in Pittsburgh; within the first month of J.B.'s residence in Pittsburgh, his father made efforts to secure a job in the United States and elsewhere, indicating at one point that he felt "dirty" that J.B. might not have a home to return to in Germany at the end of that year, J.A. 200; at the time of the move, both Petitioner and Respondent recognized their marriage had become acrimonious, and according to Respondent, whom the District Court generally found more credible, the parties had agreed to divorce and it was only "a matter of time [as to] when," J.A. 421-22; and the parents' emails are explicit that they intended to continue living separately in future years and for J.B. to alternate between them, spending the 2015-2016 academic year in Pittsburgh, the 2016-2017 academic year in Germany, and the 2017-2018 academic year back in Pittsburgh. Thus, this is not a case, as in *Mozes*, where the noncustodial parent's country had served to that point as their "home countr[y]" or where it can be said the "normal expectation" of the parties was that they would return to that country to live as a family unit. *See Mozes*, 239 F.3d at 1083.

Petitioner, argues, however, that we should disregard those portions of the parents' communications reflecting that they had agreed that J.B. would "spend alternate years with [them] when the agreement was made," J.A. 178, or that J.B. would be returning to Pittsburgh for the 2017-2018 school year, and that we should limit our consideration of the parents' agreement to those excerpts in which they discuss

29

J.B.'s return to Germany for the 2016-2017 school year. This we decline to do. For as we have repeatedly recognized, the parents' agreement as to the allocation of custody between them is highly relevant to the determination of "shared parental intent." *See, e.g., Karkkainen*, 445 F.3d at 292-93, 296-97; *Whiting*, 391 F.3d at 548-51. After all, the main reason we look to "shared parental intent" as part of our inquiry is its likelihood "to color [the child's] attitude to the contacts [he] is making" and to "affect the length of time necessary for a child to become habitually resident or otherwise influence a child's ability to acclimatize"—factors relevant to the determination whether the move carried a "settled purpose 'from the child's perspective.'" *Karkkainen*, 445 F.3d at 292, 296. For those reasons, where the parents have agreed, in connection with a child's move to a given residence, that the child will henceforth split time between them, and, thus, is expected to return to that residence at regular intervals going forward, that shared parental intent will undoubtedly affect the child's attitude, expectations, plans, and sense of purpose in undertaking the move to that residence.[8]

---

[8] The significance of the parents' forward-looking intent in this circumstance is different than in those cases where courts have observed that the formation of an intention to move does not convert the intended future residence into a "habitual residence." *See, e.g.*, *Feder*, 63 F.3d at 222 (citing *Friedrich v. Friedrich*, 983 F.2d 1396 (6th Cir. 1993) (holding that a mother's intention to move the child to the United States did not make the United States the child's habitual residence prior to the move)). Where a child is actually living in a given residence, and we are tasked with

30

Indeed, *Mozes*, by its terms, distinguished the "rare situation[s] where someone consistently splits time more or less evenly between two locations, so as to retain alternating habitual residences in each." 239 F.3d at 1075 n.17 (citing *Johnson v. Johnson*, 493 S.E.2d 668 (Va. Ct. App. 1997)); *see also id.* at 1084 n.50 (explaining that where a child "spent regularly alternating periods with each parent . . . , [he] might thus have acquired dual habitual residence"). And more recently the Ninth Circuit again observed in dictum that, where the child splits time between his parents' countries of residence, he may be deemed to have "consecutive, alternative habitual residences" where supported by the facts. *Valenzuela v. Michel*, 736 F.3d 1173, 1178-79 (9th Cir. 2013) (noting that the father also could have prevailed by showing that the father and the mother "shared a settled intention to abandon Mexico as the [children's] *sole* habitual residence").

Likewise, the courts of other Hague Convention member states have consistently recognized that the existence of a so-called "shuttle custody" arrangement, in which a child splits time between his parents' countries of residence, bears on the determination of habitual residence. *See, e.g.*, *Wilson v. Huntley*, 2005 Carswell Ont. 1606, at ¶¶ 8, 32, 50 (Can. Ont. Sup. Ct. J.) (WL) (holding that, where the child split her time in three-to-six month intervals between the mother and the father's homes, developing "similar social and family bonds in each State," and where the "parents clearly intended

---

determining whether the move to it was accompanied by a settled purpose, the parents' and child's expectations that the child will return to that residence on a regular basis in the future is necessarily relevant to the child's attitude regarding the move itself.

to share custody of [the child], in the legal sense and in the sense of physical, residential custody," the child "could have consecutive alternative habitual residences in two different States at separate times"); *J. v. J.* [HFD] [Supreme Administrative Decision] 1995 case no. 7505-1995 (Swed.), *translated at* https://assets.hcch.net/incadat/fullcase/0080.htm (holding that, where the parents agreed to be responsible for the child "on an alternate basis" and to "share [the child's] de facto care," the child was habitually resident in her mother's home country, where she was residing immediately prior to the retention, because the child had spent the last two years there and "ha[d] adjusted to circumstances in the place where she [wa]s living").

While we have observed in dictum that the concept of "alternating habitual residence" would appear to comport with the Hague Convention so long as "a child has only one habitual residence country at any given time," *Didon*, 838 F.3d at 322 n.20, we have not had prior occasion to address the relevance or weight of an agreement that a child split time between two parents. In doing so now, we emphasize that the parents' shared intent as to the custody arrangement between them is probative—but not dispositive—in the determination of habitual residence. That is, we agree with the observation that "where residence with two parents is divided equally, it . . . [is] unreal, in the absence of other differentiating factors, to see the residence with one parent as primary and stays with the other parent as interruptions." *Watson v. Jamieson*, 1997 Fam. L.R. 11, 14 (Scot.). At the same time, we eschew any suggestion that an agreement to alternate habitation between parents automatically equates to "alternating habitual residences." Indeed, any such categorical approach to shared custody or one-size-fits-all

32

framework for habitual residence would be inconsistent with our case law, which rejects the application of a "predetermined formula" to Hague Convention cases, *Karkkainen*, 445 F.3d at 291, and with the Convention, which contemplates a fact-specific approach and encourages a "flexible interpretation" of its terms, Eliza Perez-Vera, Explanatory Report, *in* 3 Hague Conference on Private International Law, Acts and Documents of the Fourteenth Session, Child Abduction 426, 446 (1982).[9]

Instead, we view a parental agreement that a child will split time between the parents' countries of residence as a significant consideration, but as one among others, informing the "necessarily fact-intensive and circumstantially based" inquiry a court must undertake to determine whether a child's move was accompanied by a "degree of settled purpose." *Whiting*, 391 F.3d at 547-48. Approaching the inquiry in this way, we respect both our precedent and Congress's instruction that we pay heed to "the need for uniform international interpretation of the Convention." 22 U.S.C. § 9001(b)(3)(B).

Undertaking that inquiry here, we consider, in addition to the other record evidence discussed above concerning the parents' shared expectations for J.B.'s move to Pittsburgh in 2015, the parents' agreement that J.B. would "alternate between Germany and [the] USA" going forward, J.A. 157,

---

[9] As we previously recognized, "Elisa Perez-Vera was the official Hague Conference Reporter, and her report is generally recognized as the official history and commentary on the Convention." *Whiting*, 391 F.3d at 546 n.3 (internal quotation marks omitted).

and, hence, that J.B. would be returning to Germany for only a single academic year before resuming his residence in Pittsburgh for the 2017-2018 year. In view of that agreement and the totality of the record in this case, it is apparent that J.B.'s 2015 move to Pittsburgh was accompanied, through at least the July 6, 2016 retention date, by the requisite "degree of settled purpose" and that the element of shared parental intent thus supports the United States as J.B.'s then-habitual residence.[10] *Whiting*, 391 F.3d at 549.

### 3. The Record Concerning J.B.'s Acclimatization

Petitioner asserts two points of error on acclimatization, arguing that the District Court applied the wrong retention date and, therefore, improperly considered irrelevant evidence of acclimatization, and that, when the record is limited to the proper time frame, it does not support a finding of acclimatization. While we agree that the District Court mistakenly considered post-retention-date evidence, we

---

[10] Petitioner's argument that J.B. was expected to return to Germany after the year in Pittsburgh is thus beside the point. Although Petitioner accurately catalogues the evidence supporting that expectation—e.g., the letter to J.B.'s school requesting a one-year leave of absence and stating that J.B. would return for the 2016-2017 academic year; the three-year German visas the parties and J.B. obtained before the Respondent and J.B. left the country; and that J.B. left some of his belongings behind in Germany—that evidence is entirely consistent with the parties' agreement that J.B. was to spend alternating years with each parent and that, during his year in Pittsburgh, the United States was J.B.'s habitual residence.

have no trouble concluding that error was harmless given the substantial record concerning acclimatization as of the correct retention date. *See generally Winston ex rel. Winston v. Children & Youth Servs. of Del. Cty.*, 948 F.2d 1380, 1391 n.7 (3d Cir. 1991) (holding that the court's consideration of inadmissible hearsay was harmless error where there was "sufficient evidence without [the improperly admitted evidence] to support the district court's conclusion").

The evidence of J.B.'s acclimatization to Pittsburgh as of July 6, 2016 is overwhelming. He had a tremendously successful academic year, earning nearly all As and overcoming an initial reading deficiency while demonstrating "dramatic improvement" over the year. J.A. 329, 333, 451. In addition, J.B. made friends "easily" and was, according to his teacher, "well-adjusted" overall. J.A. 330, 334. J.B. also enjoyed numerous activities outside of school, including soccer, swim team, and a robotics club, which he was handpicked to join by a fellow classmate. Over the course of the year, J.B. learned how to successfully program a robot to complete missions, despite feeling as though the task was impossible when he first started. And on his swim team J.B. mastered each of the competitive strokes, and was competing by the end of the year, looking forward to stepping up into the next group the following year.

The record, likewise, reflects that J.B. was sufficiently mature to form "meaningful connections with the people and places he encounter[ed]" in Pittsburgh. *Whiting*, 391 F.3d at 550-51. In a credibility determination, to which we defer absent clear error, *Cooper v. Harris*, 137 S. Ct. 1455, 1468 (2017), the District Court found that J.B. "exhibit[ed] an unusual degree of maturity and situational awareness," and therefore accorded "significant weight" to J.B.'s statements

35

that he was looking forward long-term to moving into a house and getting a dog in Pittsburgh, that he understood "his place in Pittsburgh," that he preferred living in Pittsburgh over Berlin because of his quality of life in the United States and because he had "more and better friends in Pittsburgh."[11] *Blackledge*, No. 16-1004, 2016 U.S. Dist. LEXIS 114543, at *12 n.6, 14-15. The *in camera* interview thus further supports the District Court's conclusion, based on the record as a whole, that J.B. had "formed meaningful connections with the people and places he encountered," *id.* at *16 (quoting *Karkkainen*, 445 F.3d at 294 (brackets omitted)), and "ha[d] attained a sufficient degree of continuity to be properly described as settled," *id.* (internal quotation marks omitted) (quoting *Yang*, 499 F.3d at 273).

While Petitioner argues the District Court relied heavily on evidence of activities post-dating the July 6 retention date, that evidence, on inspection, reduces to three minor points of testimony: J.B.'s swim team that ran from September 2015 through the end of July 2016, a summer reading challenge that ran from May 24 through August 31, and J.B.'s summer camps. Petitioner argues that any consideration of these activities constituted reversible error,

---

[11] We consider J.B.'s preference for Pittsburgh here because a child's expressed preference for a country may, considering his age and maturity, be a further indication that the child has acclimatized to that country, *see Karkkainen*, 445 F.3d at 294-95, regardless of whether that preference as stated would satisfy the "wishes of the child" defense or exception outlined in the Hague Convention, *see Yang*, 499 F.3d at 278 (citing Hague Convention, *supra*, art. 13).

36

but we are not persuaded that the District Court erred, much less that such error was prejudicial.[12]  For example, while the reading challenge extended through August 31, J.B. completed it on July 5, prior to the retention date.  And while J.B.'s participation on the swim team carried over through the end of July, the testimony related to J.B.'s involvement dating back to September 2015, with no mention of specific events between July 6 and July 31.  Even the evidence regarding summer camps is relevant to the extent it informed J.B.'s expectations and aspirations before July 6.  Moreover, any error in the District Court's consideration of this evidence was harmless because the post-retention-date activities were merely duplicative and cumulative of other evidence in the record concerning those same activities.  *See Howmet Aluminum Corp. v. Hartford Accident and Indem. Co.*, 665 F.2d 476, 478 (3d Cir. 1981) (citing Fed. R. Evid. 61) (holding that consideration of inadmissible evidence that is merely cumulative of properly admitted evidence is not grounds for remand or reversal).

In sum, given the extensive record evidence of J.B.'s success in school, his participation in various activities and sports, his many friendships, his experiences at cultural, entertainment, and sporting events, and his own stated preference for the United States, to which the District Court afforded "significant weight" because of "the degree of

---

[12] Because we conclude that any error in considering evidence beyond July 6 was harmless, we need not address the Respondent's argument that the Petitioner waived his objections to the District Court's consideration of it because he failed to preserve such objections at various points in the proceedings.

maturity and situational awareness" J.B. exhibited, *Blackledge*, No. 16-1004, 2016 U.S. Dist. LEXIS 114543, at *12 n.6, the District Court did not clearly err in its fact-finding related to J.B.'s acclimatization, nor did it commit legal error in its determination that J.B. was acclimatized to the United States at the time of retention.

## V. Conclusion

Because the parents' shared intent was for J.B. to move to the United States with a "degree of settled purpose," *Whiting*, 391 F.3d at 549, and because J.B. had acclimatized to the United States by the date of retention, we agree with the District Court's holding that the United States was J.B.'s habitual residence immediately prior to the retention date and that the retention therefore was not wrongful under the Hague Convention. Accordingly, we will affirm the order of the District Court.